**UNITED STATES of America,
Appellee,**

v.

**Ion Cornel POPA, Appellant.**

**No. 98–3017.**

United States Court of Appeals,
District of Columbia Circuit.

Argued April 30, 1999.

Decided Sept. 17, 1999.

Evelina J. Norwinski, Assistant Federal Public Defender, argued the cause for ap- pellant. With her on the briefs was A. J. Kramer, Federal Public Defender.

Anthony S. Barkow, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were Wilma A. Lewis, U.S. Attorney, John R. Fisher and Elizabeth Trosman, Assistant U.S. Attorneys.

Before: GINSBURG, SENTELLE, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

Concurring opinion filed by Circuit Judge RANDOLPH.

GINSBURG, Circuit Judge:

A jury convicted Ion Cornel Popa of making anonymous phone calls with the "intent to annoy, abuse, threaten, or harass any person," in violation of 47 U.S.C. § 223(a)(1)(C). Popa appeals, arguing that the statute is unconstitutional both on its face and as applied to his conduct, which involved calls to the office of the United States Attorney. Because we agree that the statute, as applied to Popa's conduct, violates the First Amendment to the Constitution of the United States, we reverse his conviction on that ground and therefore need not resolve his claim that the statute is unconstitutionally overbroad.

## I. Background

Popa is a political refugee from Romania. He has resided in the United States since 1986. Between April 10 and May 9, 1997 he made seven telephone calls from locations in Virginia to the office of the U.S. Attorney for the District of Columbia, Eric Holder. In the two calls that were recorded Popa refers to Mr. Holder as "a criminal, a negro," a "criminal with cold blood," and a "whore, born by a negro whore, [who] became chief prosecutor of Washington, D.C." He also claims that Holder "violated ... our rights." In the most nearly lucid passage on the tapes, Popa says:

Eric Holder is a negro. Is a negro. Which is a criminal. He make a violent crime against me, violating the rights in court of the white people. [Inaudible] negro. He's negro. Eric Holder. Criminal.

Popa was charged with violating 47 U.S.C. § 223(a)(1)(C), which makes it a crime, punishable by a fine and up to two years' imprisonment, to:

> make[ ] a telephone call or utilize[ ] a telecommunications device, whether or not conversation or communication ensues, without disclosing [one's] identity and with intent to annoy, abuse, threaten, or harass any person at the called number or who receives the communications.

Popa moved to dismiss the indictment on the ground that "this type of speech directed at a public official . . . is entitled to First Amendment protection." He argued that his derogatory references to Holder are not punishable as "fighting words," *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), and that the court should give § 223(a)(1)(C) strict scrutiny in determining its constitutionality, *see Cohen v. California*, 403 U.S. 15, 26, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971).

The district court denied Popa's motion. Applying intermediate scrutiny, the court held that the statute is constitutional on its face because it "regulates potentially expressive conduct to serve the compelling interest of protecting people from often frightening and annoying telephone harassment" and its "intent requirement . . . renders it narrowly tailored to serve this interest." The court did not respond to Popa's claim that the statute is unconstitutional as applied to his conduct.

Popa, whom the court found competent to stand trial, testified that he lacked the intent required to violate § 223(a)(1)(C) because an acquaintance with whom he was staying had plied him with liquor, made him read Ku Klux Klan literature, and threatened to turn him out into the street if he refused to make the calls. The court instructed the jury that in order to convict Popa they had to find beyond a reasonable doubt that he "had the intent to annoy, abuse, threaten or harass any person at the number called." The court defined those terms as follows:

> To annoy means to irritate, to bother, to make someone angry by repeated action; to abuse means to use insulting, coarse or bad language about or to someone; to threaten means to make an expression of one's intention of hurting or punishing or destroying the other person; and, fourth, to harass means to trouble, to worry or torment.

After less than an hour of deliberation the jury found Popa guilty. The district court sentenced him to time served, which was nearly nine months.

## II. Analysis

On appeal Popa again argues that § 223(a)(1)(C) is unconstitutional both as applied and on its face. Whether the Government has infringed a defendant's rights under the First Amendment is, of course, a question of law, which we would normally review *de novo*. *See United States v. Doe*, 968 F.2d 86, 88 (D.C.Cir. 1992). The Government agrees that we should entertain Popa's facial challenge *de novo* but claims that, because he neither argued to the district court nor testified at trial that his speech was political in nature, we should not reach his as applied challenge, *see Henderson v. Lujan*, 964 F.2d 1179, 1183 (D.C.Cir.1992), or should review it only for plain error, *see United States v. Spriggs*, 102 F.3d 1245, 1257 (D.C.Cir. 1996). In this the Government errs with regard to both the facts and the law.

Plaintiff's pretrial motion was adequate to preserve his as applied challenge for appeal because, even if it did "not state explicitly the grounds upon which [it was] made," it did "contain facts and arguments that [made] clear the basis of [his] objections." *United States v. Bailey*, 675 F.2d

1292, 1294 (D.C.Cir.1982); *accord United States v. Daniels*, 770 F.2d 1111, 1114–15 (D.C.Cir.1985) (*Bailey* standard not demanding); *see also United States v. Mitchell*, 951 F.2d 1291, 1297–98 (D.C.Cir.1991). Specifically, Popa's motion presents the relevant facts, namely, that he made comments critical of a public official; and it sets out the legal arguments at the base of his objection, namely, that his use of epithets did not render his speech unprotected and that the district court should apply strict scrutiny.

Although the district court did not address the as applied challenge, it denied Popa's motion in no uncertain terms. Popa was therefore under no obligation to seek rehearing, to raise the issue again at trial, or to request jury instructions on the protection of political speech. *See United States v. Madoch*, 149 F.3d 596, 600 (7th Cir.1998) ("Although [the defendant] failed to renew an objection [based upon *Miranda*] … at the time the government introduced [her statements] at trial, the district court's clear ruling on [her] motion *in limine* is sufficient to preserve the issue for appeal"); *United States v. Mejia–Alarcon*, 995 F.2d 982, 986 (10th Cir.1993). In addition, Popa did testify in essence, if not in terms, that his speech was political in nature.\* Accordingly, we review that claim *de novo*.

### A. Level of Scrutiny

Popa contends his conviction was based upon "the expressive content of his speech," that is to say, that there "was no conduct, separate from his communication, that would have caused his conviction." Therefore, he says, we should give strict scrutiny to the law as applied.

The Government, on the other hand, contends that § 223(a)(1)(C) is content neutral and therefore that we should apply intermediate scrutiny. First, because the prohibition applies by its terms "whether or not conversation or communication ensues," the Government reasons that the statute cannot be viewed as making punishment depend upon the content of the defendant's speech. Second, § 223(a)(1)(C) focuses not upon how the speech affects the listener, which would clearly turn upon the content of that speech, but rather upon the intent of the speaker; and the intent of the speaker, the Government argues, is not the same as the content of his speech even if the content may, as in this case, be evidence from which a jury can infer the speaker's intent. In support of its argument, the Government cites a decision of the Second Circuit holding that a similar Connecticut statute "[c]learly … regulates *conduct*, not mere speech. What is proscribed is the making of a telephone call, with the requisite intent and in the specified manner." *Gormley v. Director, Conn. State Dep't of Probation*, 632 F.2d 938, 941–42 (1980) (emphasis in original).

Even if, as the Government maintains, § 223(a)(1)(C) "is a generally-applicable regulation directed at conduct," it does not follow that the statute is content neutral. As Popa notes, § 223(a)(1)(C), unlike the Connecticut statute challenged in the Second Circuit, applies only if the person makes the call "without disclosing his identity." This at least appears to make the prohibition depend upon the content of the call. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (requirement that literature designed to influence voters in

---

\* Popa said he called Holder to complain about an event in 1992 during which "two Afro–American police officers [were] dispatched" in response to his call complaining that he had been "threatened by an Afro–American." Popa said that the officers "came after me and beat me up." (The Government itself introduced in evidence a letter that Popa wrote to Holder while awaiting trial in which

he referred to this event and stated that whites beaten by blacks "do not get any justice.") Popa also testified that he called Holder to complain about the Government's actions in a pending case against him for making threats to an employee of a bank; he claimed the Government had "fail[ed] to give me in advance what government witnesses are against me."

election contain name and address of persons responsible for documents "is a direct regulation of the content of speech"); cf. NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 462, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

In the end, however, we need not decide whether § 223(a)(1)(C) is content based. For accepting the Government's argument that any incidental restriction § 223(a)(1)(C) places upon speech in a particular case is content neutral, we would—as the Government suggests—apply intermediate scrutiny, see Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 652, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994), and the statute, as applied to Popa, does not survive even that less searching inquiry.

## B. Narrow Tailoring

■ In United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the Court held that for cases in which " 'speech' and 'nonspeech' elements are combined in the same course of conduct," id. at 376, 88 S.Ct. 1673, a government regulation passes intermediate scrutiny if:

[1] it is within the constitutional power of the Government; [2] it furthers an important or substantial governmental interest; [3] the governmental interest is unrelated to the suppression of free expression; and [4] the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

Id. at 377, 88 S.Ct. 1673. Popa claims only that § 223(a)(1)(C) fails the fourth part of the O'Brien test.

The Supreme Court has explained that the fourth part is satisfied so long as the substantial government interest promoted by the regulation "would be achieved less effectively absent the regulation." Turner Broad. Sys., 512 U.S. at 662, 114 S.Ct. 2445. In O'Brien, the Court upheld a

statute that prohibited the burning of draft cards because it "perceive[d] no alternative means that would more precisely and narrowly assure the continuing availability of issued Selective Service certificates than a law which prohibits their wilful mutilation or destruction." 391 U.S. at 381, 88 S.Ct. 1673. In Turner Broadcasting, the Court upheld the "must-carry" law, which required cable television systems to carry local broadcast stations on some of their channels in order to preserve the economic viability of broadcast stations for the 40 percent of American households without cable. See Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 215–16, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997). The cable systems argued that the law was too broadly drawn because it permitted a few hundred network affiliates to opt for "must-carry" treatment even though their economic viability was not threatened. Nonetheless, the Court held that number "insufficient to render must-carry 'substantially broader than necessary to achieve the government's interest.' " Id. at 217, 117 S.Ct. 1174.

In determining whether the incidental restriction § 223(a)(1)(C) places upon speech "is no greater than is essential to the furtherance of [an important governmental] interest," we need consider only the "annoy, abuse, ... or harass" forms of the intent element.** Popa argues that the Government's interest in protecting individuals from annoying, abusive, and harassing phone calls would be equally well served if the statute did not encompass "public or political discourse [intended to] 'irritate,' 'bother,' 'insult,' etc." As Popa correctly points out:

The statute sweeps within its prohibitions telephone calls to public officials where the caller may not want to identify [him]self other than as a constituent and the caller has an intent to verbally

---

** There is no evidence in the record to support a claim that Popa made the phone calls with the intent to threaten and Popa does not argue that the intent to threaten component needs to be drawn more narrowly.

"abuse" a public official for voting a particular way on a public bill, "annoy" him into changing a course of public action, or "harass" him until he addresses problems previously left unaddressed. Recall that Popa testified he called Holder's office, among other things, to complain about having been assaulted by police officers and about the prosecutor's conduct of a case against him.

The Government responds that § 223(a)(1)(C) is already narrowly drawn because it contains a "stringent specific intent requirement." Certainly the statute would be broader still if it required only a general intent—if, for example, it penalized making an anonymous phone call that had the effect of annoying, abusing, or harassing the recipient of the call. That § 223(a)(1)(C) is not as broad as it could be, however, does not suggest that it is as narrow as it must be to pass intermediate scrutiny.

The Government also argues that calls such as Popa's can impede its undoubted interest in "operational efficiency." *United States v. National Treasury Employees Union,* 513 U.S. 454, 473, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995). There is, however, no evidence that Popa's seven phone calls over the course of a month in any discernable way impeded the efficiency of the U.S. Attorney's office. Indeed, we can safely say the Government's interest in efficiency "is simply not implicated on the facts before us," which entail the brief distraction of the clerical staff who answered Popa's calls. *Texas v. Johnson,* 491 U.S. 397, 407, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (if "interest asserted by the State is ... not implicated ... we need not ask whether *O'Brien*'s test applies").

Moreover, the Government never even suggests that its interest would be less effectively furthered by a statute applicable only to callers who did not intend to engage in public or political discourse. Instead, it argues that Popa's calls had no political content; we reject that position

because complaints about the actions of a government official were a significant component of his calls. In the alternative, the Government notes that "[p]olitical motivations simply do not insulate someone from criminal liability for violating content-neutral, generally-applicable, conduct-regulating statutes." True enough, but such statutes are still subject to intermediate scrutiny. And unlike the interests implicit in the Government's hypotheticals—which involve killing an abortionist and giving false testimony at a criminal trial, in each case to advance a political cause—the governmental interest at stake here is no less effectively furthered by a statute that gives a pass to those who intend in part to communicate a political message.

In sum, we agree with Popa that the statute could have been drawn more narrowly, without any loss of utility to the Government, by excluding from its scope those who intend to engage in public or political discourse. Indeed, the Government itself, quoting *United States v. Lampley,* 573 F.2d 783 (3d Cir.1978), describes the interest furthered by § 223(a)(1)(C) as the "important interest 'in the protection of innocent individuals from fear, abuse or annoyance at the hands of persons who employ the telephone, not to communicate, but for other unjustifiable motives.' " *Id.* at 787. In other words, as Popa notes, the Government's "asserted interest is limited to protecting individuals from noncommunicative uses of the telephone," such as tying up someone's line with a flood of calls, each of which is terminated by the caller as soon as it is answered. Punishment of those who use the telephone to communicate a political message is obviously not "essential to the furtherance of that interest." Hence the statute fails the fourth part of the *O'Brien* test. 391 U.S. at 377, 88 S.Ct. 1673.

Finally, unlike the proffered alternatives to the must-carry law in *Turner Broadcasting,* the alternative to § 223(a)(1)(C)

that Popa suggests is substantially "less intrusive on a speaker's First Amendment interests." 520 U.S. at 217–18, 117 S.Ct. 1174. Under the statute as written, and as the jury in this case was instructed, no protection whatsoever is given to the political speech of one who intends both to communicate his political message and to annoy his auditor—an auditor who might be his elected representative or, as here, an Officer of the United States appointed by the President with the advice and consent of the Senate—from whom the speaker seeks redress.

\*   \*   \*

The jury was instructed that it could convict Popa if it found beyond a reasonable doubt that he had the "intent to annoy, abuse, threaten or harass any person at the number called." Because the jury delivered a general verdict, we cannot know which intent the jury concluded Popa had when he made the phone calls. Insofar as the intents to annoy, to abuse, or to harass were implicated, the statute fails intermediate scrutiny as applied to Popa's conduct; insofar as the jury may have found an intent to threaten, there is no evidence to support the finding. We therefore vacate Popa's conviction.

C.   Overbreadth Challenge

■■■  Popa also challenges the constitutionality of § 223(a)(1)(C) on the ground that the statute is overbroad on its face. This he has standing to do. *See Massachusetts v. Oakes*, 491 U.S. 576, 581, 109 S.Ct. 2633, 105 L.Ed.2d 493 (1989) ("The First Amendment doctrine of substantial overbreadth is an exception to the general rule that a person to whom a statute may be constitutionally applied cannot challenge the statute on the ground that it may be unconstitutionally applied to others"). To prevail upon such a challenge, however, especially in a case involving conduct as well as speech, the overbreadth of the statute "must not only be real, but substantial," in relation to the legitimate coverage of the statute. *Broadrick v.*

*Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). For the overbreadth doctrine is "strong medicine" to be applied "sparingly and only as a last resort." *Id.* at 613, 93 S.Ct. 2908.

Nonetheless, the Supreme Court has not always followed the "rule that a federal court should not extend its invalidation of a statute further than necessary to dispose of the case before it." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 502, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985); *see, e.g., Board of Trustees v. Fox*, 492 U.S. 469, 487 n. 2, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (Blackmun, J., dissenting) (citing cases in which the Court resolved the overbreadth challenge instead of the as applied challenge). In *Brockett* the Court distinguished between a case in which "an individual whose own speech ... may validly be prohibited ... challenge[s] a statute on its face" and one in which "the part[y] challenging the statute ... engage[s] in protected speech that the overbroad statute purports to punish." 472 U.S. at 503–04, 105 S.Ct. 2794. In the latter case the Court concluded that, because there is "no want of a proper party to challenge the statute, [and] no concern that an attack on the statute will be unduly delayed or protected speech discouraged," the reviewing court should declare the statute "invalid to the extent that it reaches too far, but otherwise [leave it] intact." *Id.* at 504, 105 S.Ct. 2794.

■■■  In this case, as we have seen, Popa engaged in protected speech that § 223(a)(1)(C) purports to punish. Therefore, pursuant to *Brockett*, having vacated Popa's conviction because the statute is unconstitutional as applied to his conduct, we shall not go on to inquire whether the statute is overbroad and, if so, whether it is susceptible to a limiting construction. *See New York v. Ferber*, 458 U.S. 747, 769 n. 24, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982).

### III. Conclusion

As applied to the conduct at issue in this case, 47 U.S.C. § 223(a)(1)(C) violates the First Amendment. The judgment of the district court is therefore

*Reversed.*

RANDOLPH, Circuit Judge, concurring:

I do not agree with the government that § 223(a)(1)(c) "is a generally-applicable regulation directed at conduct." Brief for Appellee at 18. A hang-up call could, I suppose, be characterized as conduct only. So too perhaps calls consisting only of a grunt or a moan. Nonetheless, in general, telephones are devices for communicating and this statute regulates how telephones may be used for that purpose. The acts of picking up the phone and dialing are conduct. The act of speaking on the phone is also a form of conduct but it still is "speech." Whether the caller is exercising his "freedom of speech" depends on what he says and why. A blackmail attempt, a bomb threat, a fraudulent promise, a kidnapper's demands—all are communications, but none are protected by the First Amendment. Partly this is because of history; partly it is because of the consequences of such communications. To characterize anonymous telephone calls intended to annoy or harass as "conduct" rather than speech is to confuse the analysis.